UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LA REUNION FRANCAISE SOC. ANON. | : | Hon. Joseph H. Rodriguez |
| D'ASSURANCES ES DES REASSURANCES, | : | |
| et al., | : | Civil Action No. 01-5612 |
| | : | |
| Plaintiffs, | : | OPINION |
| v. | : | & |
| | : | ORDER |
| J.E. BRENNEMAN CO., INC., et al., | : | |
| | : | |
| Defendants. | : | |

This matter has come before the Court on Plaintiffs' renewed motion for summary judgment based on policy wordings [158] and Defendants' cross-motion for summary judgment [165]. The Court has considered the submissions of the parties and heard oral argument on the original motions on February 9, 2006. The discussion placed on the record that date is hereby incorporated into the Court's opinion.

Through this declaratory judgment action, Plaintiffs, the underwriters on two policies of marine insurance insuring Defendant J.E. Brenneman Co., Inc., seek a determination that there is no coverage under 1995 and 1996 Protection & Indemnity Insurance Policies for claims seeking damages resulting from a May 18, 2000 pier collapse. Brenneman has asserted that a duty to defend was triggered by the allegations made against it in a limitation of liability action. The company has argued that indemnification is warranted under the P&I policy for liabilities arising out of the claims of negligence in its ownership, use, and operation of the crane barge ATLAS in 1995 and 1996, which alleged negligence may have caused physical damage to property and consequential damages related to the pier collapse.

BACKGROUND FACTS

The underlying facts of the case have been set forth in detail in this Court's prior Orders, notably that of June 3, 2003.  The Court repeats them here.

Before this Court is a dispute over insurance coverage, which arose as the result of the tragic May 18, 2000 collapse of a pier on the Delaware River.

Pier 34 was built in its final form (1200' x 555') in 1909 for the Philadelphia and Reading Railroad Company.  JA[1], Exh. 24, R. Hudson Dep., Exhibit 100.  It was built on hundreds of piles driven into the mud of the Delaware River.  Id.

Michael Asbell and Eli Karetny were, respectively, the owner and the operator of the business on Pier 34.  JA, Exh. 18, Preliminary Hearing, Stipulation and Testimony of J. Jones, pp. 13-17; Appendix, Exh. 2, HMS Amended Complaint, ¶ 1.  Mr. Asbell has a controlling interest in Portside Investors, L.P., which, by May 2000, was the business entity that was the owner of Pier 34, JA, Exh. 18, Preliminary Hearing, Stipulation, pp. 13-17.  Portside leased the Pier to HMS Ventures on December 29, 1995.  Id.; Appendix, Exh. 2, HMS Amended Complaint, ¶ 32.  Eli Karetny was President of HMS Ventures and was completely in charge of all operations at Pier 34 on behalf of HMS Ventures. JA, Exh. 18, Preliminary Hearing, Stipulation, pp. 13-17.

In November 1994, Pier 34 suffered an inshore, upriver collapse.  Appendix, Exh. 3, Amended Master Long Form Complaint, ¶ 66.  In mid-1995, Brenneman stabilized and repaired an inshore, upriver collapse areas on Pier 34 pursuant to a written contract

---

[1]  As the parties have done, the Court has referred to the Joint Appendix attached to the Affidavit of Timothy I. Duffy, Esq. in support of the original cross-motion for summary judgment.

with Pier 34 Restaurant, L.P. dated May 24, 1995. Appendix, Exh. 2, HMS Amended

Complaint, ¶ 15. Thereafter, pursuant to an accepted June 13, 1995, proposal,

Brenneman installed four plumb and spur piles at the area of the concrete seawall on

Pier 34 determined to be out of plumb. Id. at ¶ 18.

Over the years, the Delaware River took its toll on Pier 34, and by November 1,

1995, Brenneman's president, Robert Hudson, recommended that the entire 120 feet of

the outshore end of the pier be rebuilt with new pilings to prevent continued downriver

movement of the outshore pier. JA, Exh. 16, Preliminary Hearing, Testimony of M.

Klein, pp. 20-35. That suggestion was not accepted by Portside or HMS. Id.

Alternatively, certain A-frame piling were driven by Brenneman on the upriver and

downriver sides of the pier and the outshore end of the pier from November 1995 and

March 1996. Id.; Appendix, Exh. 2, HMS Amended Complaint, ¶¶ 28-30, 35. A January

19, 1996, contract was entered into between Portside and Brenneman for this

reinforcement work. Id.

The crane barge ATLAS, after being towed to the Pier 34, was used as the working

platform to drive the piles. Appendix, Exh. 4, Brenneman Complaint for Exoneration.

According to Robert Hudson, the movement of the pier was dramatically reduced by

December 1995, and Brenneman was not retained to monitor movement of the pier after

December 1995. JA, Exh. 15, Preliminary Hearing, Testimony of R. Hudson, pp. 174-

176. After mid-1996, Brenneman did not perform any more work on the pier and went

out of business in 1998. Id. at p. 177.

In early May 1999, a barge became stuck under Pier 34, and Mr. Hudson went to

Pier 34. While at the pier, Mr. Hudson observed that a bolt on an expansion joint had

moved an inch, and he also observed separation in the ceiling of a building.  JA, Exh. 15, Preliminary Hearing, Testimony of R. Hudson, pp. 177-183.  Pictures were taken and Mr. Karetny was advised that the pier was moving downriver.  Id.

Jesse E. Tyson of Commerce Construction also visited Pier 34 in early May 1999. JA, Exh. 19, J. Tyson Dep., pp. 312-18, 348, 366-72.  He and Hudson observed twisted A-frame piles on the outshore end of the pier.  Id.  He advised Mr. Karetny of the twisted frames and told him to tell Michael Asbell.  Id.  Ray Sullivan of Commerce Construction took pictures of the pier on May 12 and May 13, 1999, showing the twisted A-frame piles on the outshore end of the pier.  Id.  The twisted A-frame piles confirmed the pier was moving.  Id.

Carlos Carpets first installed carpet on Pier 34 in 1997 and about one year later made changes to the carpet when the restaurant on the pier was converted into the Ballroom.  JA, Exh. 20, D. Ascher Dep., pp. 14-15, 24, 30, 71.  In the fall of 1999 the seams of the carpet began to open in the Ballroom, and Carlos Carpet was contacted by Mr. Karetny for repairs.  Id.  When the carpet was pulled back on October 1, 1999, in some places a two to two and one-half inch crack in the floor was observed, which ran almost the entire length of the Ballroom at various widths.  Id. at p. 35; JA, Exh. 23, T. Trotman Dep., pp. 314-20.  Carlos Carpets "filled the gap with small stones, poured large black stones mixed with sand and concrete and filled with regular concrete."  JA, Exh. 20, D. Ascher Dep., p. 65; Exh. 17, Preliminary Hearing, Testimony of C. Ascher, pp. 187-203.  The crack in the concrete floor was about 14 feet from the outshore end of the Ballroom, and was the exact same construction joint which opened up in May 2000 before the Pier Collapse.  JA, Exh. 20, D. Ascher Dep., pp. 75-76.

Carlos Carpet was called out again by Mr. Karetny in January 2000 for shifting and opening seams in the Ballroom at the same location.  JA, Exh. 20, D. Ascher Dep., pp. 60-62.  On the January 20, 2000, invoice to HMS Ventures, Charles Ascher of Carlos Carpets wrote: "This [i.e., the seams opening] is going to be an ongoing problem." JA, Exh. 17, Preliminary Hearing, Testimony of C. Ascher, p. 180.  Tracy Trotman, a general maintenance worker at Pier 34, confirmed the appearance of the crack in the fall of 1999 when the carpet started to rip: "It was a small hair-line crack that ran on the outside of the blacktop, the blacktop being towards the helicop pad, and it ran inward, and it cracked through the building, and split the wood up on the beam,, so that's where the carpet started to break from the corner and the rest is history."  JA, Exh. 23, T. Trotman Dep., pp. 99-100.

Continued outshore Pier 34 movement downriver resulted in a substantial crack opening at the same location of the September 1999 and January 2000 repairs.  The crack, three to eight inches wide, ran across the entire length of the pier.  JA, Exh. 21, M. Grimaldi 1/24/01 Dep., pp. 112-118.

Apart from the crack, continued movement of the Pier was indicated by three other events in early May 2000.  An outward portion of the deck became bouncy because the support beams had shifted.  JA, Exh. 21, M. Grimaldi 1/20/02 Dep., pp. 87-100; Exh. 23, T. Trotman Dep., p. 138.  Cinder blocks were installed to support the deck boards.  Id.  Second, gas pipes were twisted and had broken as a result of pier movement.  JA, Exh. 18, Preliminary Hearing, Testimony of J. Jones, pp. 85, 139, 142. These were repaired by Suburban Propane on May 9 and 10, 2000.  Id.  Finally, the outshore Ballroom wall was no longer plumb due to the shifting pier.  JA, Exh. 23, T.

5

Trotman Dep., pp. 134-138, 302-04; Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 119-21, 285-87, 322-23; Exh. 22 M. Grimaldi 3/1/02 Dep., pp. 25, 94-97.  A roof inspection on May 17 or 18, 2000, revealed the Ballroom and the pier were "leaning." Id.  An insurance adjuster inspected the Ballroom on May 17 and Mark Grimaldi of Grimaldi Contractors discussed remodeling and shortening the Ballroom with Tracy Trotman to bring the Ballroom inshore of the expanding construction joint.  Id.

With respect to the crack, Daniel Ascher of Carlos Carpet observed a crack three to four inches in width and twelve inches deep on Tuesday, May 16, 2000.  JA, Exh. 20, D. Ascher Dep., pp. 46, 49-50.  He returned on May 18 to reinstall the carpet, but the crack had opened up again after repairs.  Id.  Mark Grimaldi described the crack as eight inches wide, sixty feet long and its depth up to six inches.  JA, Exh. 22, M. Grimaldi 3/1/02 Dep., p. 67.  Grimaldi Constructors filled the crack with concrete on Tuesday, May 16 and by Wednesday, the crack had widened one-half to one inch and dropped.  Id. at 72-73; Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 90-92.  Carl Steffan of Grimaldi Constructors monitored the crack on Wednesday and it continued to expand.  JA, Exh. 22, M. Grimaldi 3/1/02 Dep., p. 77.  Galvanized steel plates were purchased to cover the crack as Mr. Karetny indicated that the recurring crack would need to be repaired "continually for the life of the pier."  JA, Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 129-32.

On Tuesday, May 16, HMS Ventures requested an inspection dive by Commerce Construction.  JA, Exh. 19, J. Tyson Dep., pp. 414-17; Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 143-45.  The dive disclosed that fine debris was coming out of the underside of the pier.  JA, Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 168-69.  While on the dive boat, Mr. Grimaldi, Mr. Tyson and Mr. Karetny observed and commented on twisted A-frame piles at the upriver, outshore end of the pier.  Id. at pp. 157-61.

Mr. Tyson returned to Pier 34 at Mr. Karetny's request on Thursday, May 18.  JA, Es. 19, J. Tyson Dep., p. 555.  Mr. Tyson was shown by Mr. Grimaldi and Mr. Karetny the expanding crack in the Ballroom floor, openings in the deck and sea walls on both the upriver and downriver side, and a sheared bolt on an expansion plate over the crack. Id. at pp. 558-564, 585-87; JA, Exh. 21, M. Grimaldi 1/24/02 Dep., pp. 211-23.  Tyson informed Karetny that the pier was in a state of failure, and would certainly collapse with the changing of the tide.  Commonwealth of Pennsylvania v. Karetny, 837 A.2d 474 (Pa. 2005).  Karetny instructed several employees to lay steel plates over the openings in the deck, fold a rug over the plates, and put large flowerpots on the rugs so that no one would walk on them.  Id.

At approximately 8 p.m. that evening, when the tide receded, the pier collapsed into the Delaware River.  Three young women were killed in the collapse and forty-three others were injured.  Id.

## THE PIER COLLAPSE CLAIMS

Various lawsuits were filed against Brenneman relating to the collapse of Pier 34 on May 18, 2000 (the "Pier Collapse Claims").  These Pier Collapse Claims are delineated below.

1. Personal Injury Complaint

On November 30, 2000, various personal injury plaintiffs ("Personal Injury Plaintiffs") filed a Master Long Form Complaint in the Court of Common Pleas for Philadelphia County, Pennsylvania ("Personal Injury Complaint").  Appendix, Exh. 3, Amended Master Long Form Complaint.  The Personal Injury Complaint sought damages against Portside Investors, L.P., Asbell & Associates, L.P., M. J. Asbell, Inc.,

Asbell & Associates, L.P., HMS Ventures, Inc., Brenneman and others for personal injuries resulting from the May 18, 2000 collapse of Pier 34.  <u>Id.</u>  The complaint specifically alleged as follows:

> Pursuant to the Order of the Honorable Joseph D. O'Keefe, the undersigned attorneys, on behalf of individuals and/or estates of decedents who suffered personal injuries, including death, as a result of the collapse of Pier 34 and appurtenances thereto, bring this Amended Master Long Form Complaint against the following defendants ***

>       *            *            *

> 159.  On or about May 18, 2000, plaintiffs and plaintiffs' decedents were lawfully on defendants' premises when, without warning, the pier split and part of the night club, the patrons therein and workers were dumped or thrown into the murky, cold Delaware River, resulting in injuries and/or death to plaintiffs and plaintiffs' decedents.

>       *            *            *

> 164.  The injuries to and/or death of plaintiffs and plaintiffs' decedents were caused directly and proximately by the negligent, careless, reckless and wanton behavior of defendants, jointly and/or severally.

>       *            *            *

> 166.  The aforementioned incident, injuries and death suffered by plaintiffs and plaintiffs' decedents are attributable to and are the direct and proximate result of the negligence, gross negligence and fault of the Pier 34 defendants and all of said defendants' agents, servants, employees and/or representatives.

[<u>Id.</u> at Introduction and ¶¶ 159, 164, 166.]

      2.  <u>Portside Complaint</u>

On November 6, 2000, Portside Investors, L.P., Asbell & Associates, L.P., M.J. Asbell, Inc. and Asbell & Associates, L.P., General Partner, t/a Portside Investors, L.P. (collectively, "Portside") filed a thirteen-count lawsuit in the Court of Common Pleas of Philadelphia County, Pennsylvania No. 005087 against Brenneman, among other

defendants (the "Portside Complaint").  Appendix, Exh. 1, Portside Amended Complaint.

Counts I through V and Count XIII of the Portside Complaint were directed against

Brenneman and alleged the following theories of recovery:

| | |
|---|---|
| Count I:    Breach of Contract<br>             -The 1996 Contract | Count IV: Fraudulent Misrepresentation<br>             -The 1995 and 1996 Work |
| Count II:   Breach of Express and<br>             Implied Warranties<br>             -The 1995 and 1996 Work | Count V: Misrepresentation<br>             -The 1995 and 1996 Work |
| Count III: Professional Negligence<br>             - The 1995 and 1996 Work | Count XIII: Indemnity<br>             -The 1995 and 1996 Work |

[Id.]

Each count alleged in identical fashion that Brenneman's conduct caused Pier 34

to collapse, which in turn caused various damage to Portside.  The counts specifically

alleged as follows:

> 58.  At approximately 7:30 p.m. on May 18, 2000, the outshore end of Pier 34
> collapsed into the Delaware River, resulting in the deaths of three women,
> personal injuries to several individuals, and substantial damages and losses to
> Portside and HMS, as set forth in this complaint.

> [#]  As a direct and proximate result of the wrongful acts and omissions of
> Brenneman and/or Hudson (as herein set forth), Pier 34 collapsed causing
> reasonably foreseeable, significant and ongoing damages to Portside in an
> amount in excess of $30,000,000 (the precise amount of which is not presently
> ascertainable) consisting of physical damage to the Pier, loss of personal
> property, damage to other property and assets of Portside as a result of the
> collapse, loss of rental income, costs of demolition and related expenses, damage
> to Portside's valuable name and reputation, damage to Portside's landlord/tenant
> relationship with HMS under the Lease, exposure to third-party lawsuits arising
> from death and personal injury claims, and other past and on-going damages.

[Id. at Count I, ¶ 64; Count II, ¶ 75; Count III, ¶ 82; Count IV, ¶ 91; Count V, ¶ 99; Count

XIII, ¶ 159.]

Count XIII for indemnity provided in relevant part as follows:

156.  For the reasons set forth above in all counts, defendants agreed to indemnify and hold harmless Portside from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of their work, including the 1995 and 1996 Contracts (Section 9.12) in which defendants agreed to provide such indemnity for losses or claims caused in whole or in part by the negligent acts or omissions of the defendants. (See Exhibit C, Section 9.12).

157.  The acts and omissions of defendants as alleged in this complaint were a direct and proximate cause of the collapse of Pier 34.

158.  As a result of the collapse of the pier, Portside and its partners have been named as defendants in several ongoing civil and/or potentially criminal matters alleging death, sickness and/or personal injuries, all of which Portside and its partners are defending.

[Id. at Count XIII, ¶¶ 156-58.]

3.  HMS Complaint

On November 6, 2000, HMS Ventures, Inc. ("HMS") filed a fifteen-count lawsuit in the Court of Common Pleas of Philadelphia County, Pennsylvania No. 005102 against Brenneman, among other defendants ("HMS Complaint").  Appendix, Exh. 2, HMS Amended Complaint.  Counts I through VII and Count XV of the HMS Complaint were directed against Brenneman and alleged the following theories of recovery:

Count I:   Breach of Contract/
            Third Party Beneficiary
            -The 1995 and 1996 Work

Count II:   Implied-In-Fact Contract
            -The 1995 and 1996 Work

Count III: Promissory Estoppel
            -The 1995 and 1996 Work

Count IV: Breach of Express and
            Implied Warranties
            -The 1995 and 1996 Work

Count V: Professional Engineering,
            Design and Other Negligence
            -The 1995 and 1996 Work

Count VI: Fraudulent Misrepresentation
            -The 1995 and 1996 Work

Count VII: Misrepresentation
            -The 1995 and 1996 Work

Count XV: Indemnity

[Id.]

10

Each count alleged in identical fashion that Brenneman's conduct caused Pier 34 to collapse, which in turn caused various damage to HMS. The counts specifically alleged as follows:

> 60. At approximately 7:30 p.m. on May 18, 2000, the outshore end of Pier 34 collapsed into the Delaware River, causing personal injuries and death to several individuals, and substantial damages and losses to HMS as further stated in this complaint.
>
> [#] As a direct and proximate result of the breach of contract by Brenneman and/or Hudson,[2] Pier 34 collapsed causing foreseeable, significant and ongoing damages to HMS currently estimated in excess of $25,000,000 (the precise amount of which is not presently ascertainable) including, but not limited to, losses of personal property, damage to other property and assets of HMS as a result of the collapse, loss of business, costs of demolition and other related expenses, exposure to and potential damages from claims by employees and third parties for personal injuries and death, damage to HMS' valuable name and reputation, costs to close down and possibly move HMS' business, and other past and on-going damages.

[Id. at Count I, ¶ 66; Count II, ¶ 72.]

> Count XV for indemnity provided in relevant part as follows:
>
> 171. For the reasons stated above in all counts, including that HMS is an intended third-party beneficiary to the 1995 and 1996 Contracts, the defendants agreed to indemnify and hold harmless HMS from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of their work, including in the 1995 and 1996 Contracts, section 9.12, wherein the defendants agreed to provide such indemnity for losses or claims caused in whole or in part by the negligent acts or omissions of the defendants. (See Exhibits A and B, Section 9.12)
>
> 164. The acts and omissions of the defendants as alleged in this complaint were a direct and proximate cause of the collapse of Pier 34.

---

[2] Alternatively, Count III, ¶ 81; Count IV, ¶ 92; Count V, ¶ 99; Count VI, ¶ 108; Count VII, ¶ 116' and Count XV, ¶ 174 each provided: "As a direct and proximate result of the conduct by the defendants, Pier 34 collapsed causing significant and ongoing damages to HMS ***." Appendix, Exh. 2.

165.  As a result of the collapse of the pier, HMS and its representatives and employees have been named as defendants in several ongoing civil and/or potentially criminal matters alleging death, sickness and/or personal injuries, all of which HMS is defending.  Any liability of HMS in such matters is secondary to the primary and/or sole liability of the defendants for the reasons set forth in this complaint.

[Id. at Count XV, ¶¶ 171-173.]

### 4.  Brenneman Limitation of Liability Proceeding and Contribution Claims

On March 26, 2001, Brenneman initiated a limitation of liability proceeding in the United States District Court of the Eastern District of Pennsylvania for exoneration from or limitation of liability arising out of the Pier 34 Collapse to the value of the crane barge ATLAS.  Under the title, "THE BARGE," Brenneman alleged:

7.  The Crane Barge ATLAS was, at all material times, tight, staunch, strong, and seaworthy.  The vessel was well-supplied, equipped, furnished and well and sufficiently fitted with suitable engines, appurtenances and appliances, all in good order and condition and suitable for the business and voyage upon which said vessel was engaged.  The plaintiffs, at the commencement of said voyage and at all times prior thereto, exercised due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and sufficiently fitted with suitable engines, appurtenances, and appliances.

19.  The [May 18, 2000] incident, and any losses, damages, or injuries resulting therefrom, were neither caused by nor contributed to by any fault, negligence, or lack of care on the part of [Brenneman], or anyone for whom [Brenneman] may be responsible, including the crane barge ATLAS, but instead, was caused by other parties or causes unknown.

Defendants in the Pier Collapse Claims filed contribution claims against Brenneman in that proceeding should they be held liable for damages caused by the Pier 34 Collapse.  Appendix, Exh. 4, Complaint for Exoneration from or Limitation of Liability; Appendix, Exh.1A, 2A, Contribution Claims.  As such, the Honorable William H. Yohn, Jr. filed a Restraining Order and Order that Claims be filed with the Admiralty Court, effectively removing Brenneman's presence from the State court actions.  Appendix, Exh. 5.

Subsequently, Judge Yohn granted a motion of Michael J. Asbell and Eli Karetny, defendants in that action, for a protective order temporarily staying their depositions. The Judge noted that Asbell and Karetny faced criminal charges arising from their alleged involvement with the pier's collapse.[3]  In granting the protective order, the judge reasoned:

> As the criminal case was mounting, so were defendants' fears that information discovered in their civil case might incriminate them in their criminal case. Consequently, on December 7, 2001, Asbell and Karetny obtained a ninety day protective order from Common Pleas Court Judge Alan Tereshko, staying further discovery as to them. . . .  On October 3, 2002, [Brenneman] served notices of deposition on Asbell and Karetny, who in turn filed the instant motion . . . pursuant to Federal Rule of Civil Procedure 26(c) to temporarily stay their depositions in the civil proceedings for fear that they might reveal information that could incriminate them in their criminal cases.

In re J.E. Brenneman Co., Inc., 2003 WL 1560155, *1 (E.D.Pa. March 18, 2003).

Finding that a short stay would not 1) significantly hamper the expediency of the civil litigation, 2) substantially prejudice Brenneman, or 3) burden that or any other court considering the parties' claims, Judge Yohn granted the motion.  He wrote: "The court's authority to issue such a stay 'is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.'" Id. at *2 (citations omitted).  That action has since been settled and dismissed of record.

---

[3]  Specifically, on August 21, 2001, the two were arrested and charged with the following: 1) involuntary manslaughter; 2) recklessly endangering another person; 3) risking a catastrophe; 4) failure to prevent a catastrophe; and 5) criminal conspiracy. After a preliminary hearing, they were bound over for trial in the Philadelphia Court of Common Pleas.  On June 4, 2001, however, Common Pleas Court Judge Benjamin Lerner dismissed the two felony charges, a decision which the District Attorney appealed, and on which she ultimately prevailed.

13

5. <u>The Instant Matter</u>

As stated above, through this declaratory judgment action, Plaintiffs, the underwriters on two policies of marine insurance insuring Brenneman, seek a determination that there is no coverage under 1995 and 1996 Protection & Indemnity Insurance Policies for claims seeking damages resulting from the May 18, 2000 pier collapse.  They have argued that the pier collapse in 2000 is not a loss for purposes of the 1995 and 1996 policies, as injury occurs when the damage first manifests itself.  Plaintiffs further asserted that there is no claim that the vessel did anything wrong during the covered years, 1995 and 1996.

Brenneman asserted that a duty to defend was triggered by the allegations made against it in the limitation of liability action.  It argued that if Brenneman was negligent in doing its work, the negligence was caused by the crane barge ATLAS.  Thus, Brenneman argued that it sought indemnification under the P&I policy for liabilities arising out of the claims of negligence in its ownership, use, and operation of the crane barge ATLAS in 1995 and 1996, which alleged negligence may have caused physical damage to property and consequential damages, related to the collapse of the pier.[4]  Brenneman conceded that it is not seeking coverage for professional engineering negligence claims or claims of purely contractual indemnification unrelated to any negligence, that is, liability that arises solely by reason of a contractual agreement to indemnify another party thereto absent a separate legal liability requiring such indemnification.

---

[4] It had submitted that "Brenneman seeks coverage for its liability for direct or consequential damages which occurred on May 18, 2000, but only to the extent that they 'have become liable to pay and shall pay on account of the liabilities, risks, events, and/or happenings' i.e., liabilities have arisen in the policy periods 1995 and 1996."

In 2003, Brenneman sought a declaration of its right to a defense under the policies, asserting that if there was a single claim against it as the "vessel owner" which would afford coverage under the policies, Brenneman was entitled to a defense. The trigger obligating Plaintiffs to provide a defense, according to Brenneman, was that Brenneman alleged in the limitation of liability action that it was not negligent in its use of the ATLAS in the repair of Pier 34, and each of the claimants denied that allegation in their Answers. Brenneman also asserted that in Answers to Interrogatories, HMS and Portside contended that the crane barge negligently damaged the pier, and although counsel wished to question that contention, he could not do so because the principals of HMS and Portside did not have to appear for depositions in the limitation of liability action. On the state of the record at that time, Brenneman was forced to rely on its assertion that a claim was made which, if proven, would be covered by the P&I policy.

The Court determined that further discovery would likely determine exactly what the ATLAS was alleged to have done that could result in a finding of negligence and resultant liability of Brenneman. Accordingly, the Court expressed its desire to wait for the parameters of the allegations to be defined more clearly so that the Court could assess what types of claims had been made that may or may not trigger a defense and/or coverage. Thus, this Court found that the most efficient course of action was to wait for the criminal case of Asbell and Karetny to proceed. On June 3, 2003, the Court administratively terminated this case without prejudice to the right of the parties to reopen the case once they determined that adequate discovery had been completed to more clearly define the nature of the allegations and claims which had been asserted against Brenneman that would trigger either a defense or coverage.

6. <u>Global Settlement</u>

On January 29, 2004, the Pier 34 cases were settled for $29.36 million. Brenneman's counsel informed the Plaintiffs of the settlement, and of the fact that Brenneman had contributed $600,000 through the New Jersey Property-Liability Insurance Guaranty Association.  He also wrote that the property damage claims of Portside and HMS against Brenneman were not part of the settlement.  Appendix, Exh. 13, January 28, 2004 letter.  Later, the underlying defendants, including HMS, Portside, and Brenneman, mutually released all claims against each other.  Appendix, Exh. 14, Settlement Releases.

The depositions of Michael Asbell and Eli Karetny were never taken, but still pending before the Pennsylvania Supreme Court was a petition for review of the Pennsylvania Superior Court's affirmance of the Philadelphia County Common Pleas Court's dismissal of the two felony charges against Asbell and Karentny.  On August 15, 2005, the Pennsylvania Supreme Court reinstated the felony charges against Asbell & Karetny.  In May 2007, Karetny pleaded guilty to involuntary manslaughter and reckless endangerment charges and Asbell pleaded no contest to the criminal charges against him.  On June 22, 2007, they were both sentenced to house arrest, ending the criminal case.

7. <u>The Instant Matter, Reopened</u>

During a status conference with this Court on the record on October 6, 2004, Brenneman's counsel asserted that the parameters of the allegations against Defendant Brenneman were able to be defined more clearly by certain discovery that had taken place in the previous year, so that the Court could assess what types of claims had been made against Brenneman in the underlying admiralty action that may or may not have

triggered a defense and/or coverage.  The Court therefore restored the matter to the active docket on November 1, 2004.

In the meantime, the New Jersey Property-Liability Insurance Guaranty Association had moved to intervene as a party defendant and assert a counterclaim against the Plaintiff underwriters.  The New Jersey Property-Liability Insurance Guaranty Association had provided Brenneman's defense following the insolvency of Brenneman's general liability underwriter in 2001 to the tune of approximately $450,000.  It also contributed $600,000 to the settlement of the Pier 34 cases which resulted in Brenneman obtaining a release of all claims against it as part of the global settlement of the Pier 34 litigation.  Thus, the New Jersey Property-Liability Insurance Guaranty Association sought reimbursement of all defense expenses and the $600,000 settlement contribution.

Finding a dispute as to whether the money contributed to the global settlement of the Pier 34 litigation could be construed as a contribution for property damage claims, since the settlement was of the personal injury and death claims, this Court determined that the New Jersey Property-Liability Insurance Guaranty Association had not made an adequate analysis under Fed. R. Civ. P. 24 to allow intervention.

In response, the New Jersey Property-Liability Insurance Guaranty Association filed a separate subrogation Complaint against the underwriters (Docket No. 05-cv-1974), seeking coverage and asserting bad faith.  On June 2, 2005, the underwriters filed a motion to consolidate the two cases.  The court granted the consolidation motion on February 9, 2006, finding that the question at the heart of both cases is whether the insurance policies at issue covered the pier collapse claims asserted against Brenneman.[5]

---

[5] The 2005 case has the additional issue of whether the $600,000 paid in settlement of the pier collapse claims was for personal injury or property damage.

That same date, the Court heard argument on two motions for summary judgment filed in this case by the Plaintiff underwriters, one to dismiss Brenneman's Amended Counterclaim for Bad Faith and another for summary judgment based on the policy wording.  Brenneman opposed the motions and simultaneously filed a cross-motion for summary judgment.  Because Brenneman's papers included the affidavits of Portside's attorney, Jack Jenkins, and Brenneman's counsel, Edward Cattell, Plaintiffs filed a Rule 56(f) affidavit and requested additional time to respond to Brenneman, so that they could depose the two.  The Court granted Plaintiffs' motion.  Brenneman withdrew the affidavit in question on August 26, 2005 and simultaneously filed a Motion for a Protective Order precluding Cattell's deposition, which the Court granted unless and until it could be shown that a legitimate reason existed to depose Defendant's counsel.  Brenneman also filed a Motion to Quash the deposition of John Jenkins, and Jenkins filed a pro se motion for the same relief.  Both were denied.

Discovery proceeded and on July 18, 2006, this Court ordered the Defendant, among other mandates, to provide discovery responsive to the inquiry of what "new" evidence had come to light after June 2003 which, in accord with defense counsel's representations to this Court, justified reopening the case by clearly defining what claims had been brought against Brenneman to determine whether defense and/or coverage was triggered.

Before the Court presently is a summary judgment motion filed by the Plaintiffs and Brenneman's cross-motion for summary judgment seeking a declaration of its right to be indemnified for all attorneys' fees and costs incurred in defending the Pier Collapse Claims.

<u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the

19

moving party.  <u>Andersen</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v.</u>

<u>Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

<u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  <u>Big Apple</u>

<u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

<u>CHOICE OF LAW</u>

The parties agree that, in the absence of admiralty law on point, where there is a

conflict of laws, New Jersey law should be applied in this case.  (<u>See</u> Pl. Reply Br. at p.

7.)  Under New Jersey law, it is the burden of the insured "to bring the claim within the

basic terms of the policy."  <u>Reliance Ins. Co. v. Armstrong World Indus., Inc.</u>, 678 A.2d

1152, 1158 (N.J. Super. Ct. App. Div. 1996) (citations omitted).

20

<u>P&I POLICY WORDINGS</u>

The Plaintiff Insurers subscribed to and Defendant Brenneman was issued an insurance Policy under cover no. MH94257 and renewal cover note no. MH952357, respectively.[6]  The Policy has consecutive twelve-month effective periods from December 12, 1994, to December 12, 1995, and December 12, 1995, to December 12, 1996.

The Policy's Schedule Page provides that marine protection and indemnity coverage[7] is subject to Lazards SP.23 (Revised 1/56) Form[8] as follows:

<u>NAVIGATING</u>:                Whilst afloat, not under repair, or under repair, at
                                   Assured's yard Delaware and/or berths elsewhere
                                   Or held covered at rate to be agreed.

<u>CONDITIONS</u>:                *            *            *

                                   Protection and Indemnity subject to Lazards SP.23
                                   (Revised 1/56) Form excluding Crew Liabilities, to
                                   limit US $1,000,000 any one accident any one
                                   occurrence

                                   *            *            *

                                   Excluding contract works.

[JA, Exh. 1, Policy, Schedule Page; Exh. 2, Renewal Cover Note No. MH952357.]

---

[6]  The full wordings of the Policy for 1995 under cover note no. MH94257 are available. Only the renewal cover note no. MH95257 for 1996 has been located.  The parties are in agreement that the wordings under cover note no. MH95257 are identical to the wordings under cover note no. MH94257, except for the time period.

[7]  Protection and indemnity insurance was developed to provide protection to shipowners for losses arising in connection with the operation of their vessels. Raymond P. Hayden & Sanford E. Balick, <u>Marine Insurance: Varieties, Combinations, and Coverages</u>, 66 Tul. L. Rev. 311, 325 (1991).

[8]  The standard AIMU SP.23 Form is also known as the Lazards SP.23 (Revised 1/56) Form.  <u>Benedict on Admiralty</u>, Vol. 7A, § 2.01 A1 (2001).

The SP.23 Form provides marine protection and indemnity coverage as follows:

PROTECTION AND INDEMNITY
Loss, if any, payable to CPF Premium Funding, Inc., 1983 Marcus Avenue, Chadds Ford, PA 11042 at and from the 12th day of December, 1994, at Noon time until the 12th day of December, 1995 at Noon time against the liabilities of the Assured as hereinafter described, and subject to the terms and conditions hereinafter set forth, in respect of the vessel called the As per Schedule * or by whatsoever other names the said vessel is or shall be named or called.

        *             *             *

The Assurer hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, **all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay** and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:

(1)     Liability for loss of life of, or personal injury to, or illness of, any person ***

(2)     Liability for hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, personal injury to, or illness of any member of the crew of the vessel named herein or any other person.  Liability hereunder shall also include burial expenses not exceeding Two Hundred ($200) Dollars, when necessarily and reasonably incurred by the Assured for the burial of any seaman of said vessel.

        *             *             *

(6)     Liability for damage to any dock, pier, harbor, bridge, jetty, buoy, lighthouse, breakwater, structure, beacon, cable, or to any fixed or movable object or property whatsoever, except another vessel or craft, or property on another vessel or craft.

        *             *             *

(14)    Costs, charges, and expenses reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, subject to the agreed deductibles applicable, and subject further to the conditions and limitations hereinafter provided.

GENERAL CONDITIONS AND/OR LIMITATIONS

        *             *             *

      Unless otherwise agreed by endorsement to this policy, liability hereunder shall in no event exceed that which would be imposed on the Assured by law in the absence of contract.

\*                              \*                              \*

> Liability hereunder in respect of any one accident or occurrence is limited to the amount hereby insured.

[JA, Exh. 1, Policy, SP.23 Form.]

Typically, a hull policy affords insureds financial protection for loss or damage to owned vessels.  Raymond P. Hayden & Sanford E. Balick, <u>Marine Insurance: Varieties, Combinations, and Coverages</u>, 66 Tul. L. Rev. 311, 315 (1991).  The coverage may encompass damage to vessel appurtenances such as furnishings, life boats, and even leased equipment installed on the ship for which the insured is responsible.  <u>Id.</u>  Hull policies may extend to another vessel in the event of collision in which the insured vessel is at fault.  <u>Id.</u>  Usually, hull coverage is predicated on the existence of a loss due to an insured peril, whether or not the specified peril arises out of the insured's ownership of the vessel.  <u>Id.</u>

Brenneman has cited to the "Hull" portion of the Marine Policy in this case:

10  PROTECTION AND INDEMNITY

10.1  The Underwriters agree to indemnify the Assured for any sum or sums paid by the Assured to any other person or persons by reason of the Assured becoming legally liable, as owner of the Vessel, for any claim, demand, damages and/or expenses, where such liability is in consequence of any of the following matters or things and arises from an accident or occurrence during the period of this insurance:

10.1.1  loss of or damage to any fixed or movable object or property or other thing or interest whatsoever, other than the Vessel, arising from any cause whatsoever in so far as such loss or damage is not covered by Clause 8

10.2.5  legal costs incurred by the Assured, or which the Assured may be compelled to pay, in avoiding, minimizing or contesting liability with the prior written consent of the Underwriters.

<u>COVERAGE ANALYSIS</u>

Construing insurance policies requires a broad search "for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purposes of the policies." <u>Royal Ins. Co. v. Rutgers Cas. Ins. Co.</u>, 638 A.2d 924, 927 (N.J. Super. Ct. App. Div. 1994). As may be seen from the wording of the policies, P&I insurance only covers claims that arise in direct connection with the operation of the covered vessel. Specifically, the policies covered "loss" during the policy periods against liabilities "in respect of the vessel." Further, as is typical, the obligation for the underwriters to pay under the P&I policy is on an indemnification basis. Plaintiffs undertook "to make good . . . all such loss and/or damage and/or expense as [Brenneman] as owner[] of the vessel . . . [has] become liable to pay." The SP-23 indicates that Plaintiffs were to "pay on account of" fourteen enumerated "liabilities, risks, events and/or happenings," including personal injury, damage to a pier, and costs of defending "against any liabilities insured against hereunder in respect of the vessel."[9]

To find coverage, New Jersey law requires an actual injury during the policy period. <u>Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.</u>, 483 A.2d 402, 403 (N.J. 1984). Plaintiffs originally denied coverage for the Pier Collapse Claims because the claims sought liability for injury caused by the May 18, 2000 collapse of Pier 34, and the last policy obligating Plaintiffs expired in December 1996. Thus, Plaintiffs determined there was no "loss" during the policy period, and therefore no coverage for

---

[9]Even under the hull portion of the marine policy, Plaintiffs are responsible for indemnification of monies paid for loss or damage during the policy period only on liability as owner of the vessel.

the Pier Collapse Claims in the first instance.  The Court need not address the question of whether there is evidence of a claim that the pier sustained injury in 1995 or 1996, because analysis of the second prerequisite to coverage – that Brenneman's liability be in its capacity as owner of the vessel – proves dispositive.

Plaintiffs argue next that they were not presented with any clear-cut claim in which Brenneman as owner of the vessel ATLAS had become liable to pay, or even in which Brenneman could become liable to pay in its capacity as owner of the vessel. Indeed, this Court has struggled with the issue of whether a claim ever was asserted against Brenneman in its capacity as owner of the vessel to trigger coverage.  The question that the Court has been asking throughout this litigation remains:  Was there a claim asserted against Brenneman as owner of the vessel ATLAS?

The gravamen of the Pier Collapse Claims was that Brenneman and the other defendants acted negligently in performing their work.  Portside complained of the wrongful acts and omissions of Brenneman, while HMS focused on breach of contract. Plaintiffs have no responsibility for contractual liability of Brenneman.  The Pier Collapse Claims against Brenneman also were not covered by the policies here because none were asserted against Brenneman it in its capacity as vessel owner.  The defense has acknowledged that the vessel ATLAS was not mentioned in any of the complaints filed in State court; there was no indication that any negligence claim against Brenneman arose out of its ownership and operation of the vessel ATLAS or involved its status as a vessel owner.

Of course, the Court has been here before.  In arguing the cross-motions for summary judgment in 2003, Brenneman's attorney convinced the Court that discovery

was necessary to illuminate such a claim – "to find out what it is that they say Brenneman did." (Document [102], Oral argument Tr. at p. 16.) The case was stayed pending further criminal proceedings of Asbell and Karetny in respect of their 5th Amendment rights. Before the criminal case was resolved, however, Brenneman's attorney was before the Court with a representation that new evidence had come to light to clarify what claims had been made against Brenneman so that the Court could determine whether a duty to defend or indemnify was triggered. The Court reopened the case and allowed discovery so the Plaintiffs could discover the new evidence that there was asserted a claim that the crane barge ATLAS negligently damaged the pier in 1995 or 1996.

Even now, however, there are no allegations to be found in the claims asserted in each of the Pier Collapse cases that the crane barge ATLAS was negligent, and there are no allegations of a liability-causing act that directly involved the vessel. Thus, it appears that the terms of the policies at issue here do not cover the allegations asserted against Brenneman in the Pier Collapse Claims. Rather, as far as the Court can ascertain, counsel for the defense has attempted to glean a covered claim from (1) the Answers to the Limitation of Liability Complaint that respond "Denied" in response to Brenneman's counsel's allegations; (2) the answers to contention interrogatories; and (3) the 2005 Affidavit of John L. Jenkins, Esq.[10]

---

[10]John Jenkins, Portside's counsel, provided an affidavit stating that Portside agreed to release Brenneman from all claims as part of the overall settlement, and at Brenneman's request, Jenkins included a footnote in the Settlement Agreement, stating that Brenneman's settlement contribution was "in settlement of the property damage claims asserted [by HMS and Portside]." More telling, however, is a review of the Portside complaint, which did not allege property damage to the pier by the ATLAS during the policy periods.

As discussed above, Brenneman filed a limitation of liability Complaint, in which it asserted that its vessel did not negligently damage Pier 34, and Portside and HMS filed Answers, denying Brenneman's allegations of lack of negligence.  Where the complaints against an insured fail to make out a covered claim against it, the Court does not see equity in allowing the non-covered defendant to "create" coverage by filing a separate limitation of liability action.  It certainly appears that Brenneman filed the exoneration proceeding with the hope of triggering coverage.  Brenneman crafted the limitation of liability action here, and Portside and HMS's pro forma denials to the allegations in that Complaint cannot serve to give rise to claims that were not asserted against it originally.

Also, Brenneman served interrogatories on Portside and HMS asking whether they contended that ATLAS negligently damaged Pier 34 in 1995 and 1996, and Portside answered, "Yes, among other things, Defendants contend that the crane barge ATLAS negligently damaged Pier 34."  Noting that no other questions were asked, Plaintiffs argue that Brenneman used this tactic to "bait [Portside and HMS] into alleging that they were seeking a loss for incidental injuries and that the ATLAS (and not just Brenneman) was involved."  (Pl. Reply Br. at p. 26.)  Obviously, HMS and Portside would welcome an opportunity to defray their own liability for the pier collapse, and the Court agrees that the responses to contention interrogatories here cannot form the basis of a claim sufficient to invoke coverage.

Finally, the Court cannot accept that because Brenneman's repairs to the pier were performed "by and from the barge ATLAS," any allegation of negligence in repair of the pier necessarily is an allegation of the barge ATLAS.  Allegations that Brenneman was negligent in performing its work as a marine contractor do not, by necessity, implicate the vessel.

27

In summary, Brenneman was sued only for damages caused by the May 18, 2000 pier collapse. The policies at issue here do not cover any personal injury claims resulting from the pier collapse, because the injuries did not occur until after the expiration of the polices. The policies also do not cover any property damage alleged because the coverage here does not extend to situations in which the liability-causing act does not directly involve the vessel, and the Court finds no allegations of negligence on the part of ATLAS and no indication that Brenneman was sued in its capacity as owner of the vessel ATLAS.[11]

Plaintiffs also have argued that there is no independent duty to defend triggered by mere allegations in this case because the policies provide reimbursement for defense costs only upon satisfaction of the prerequisites to indemnity coverage in the first instance – that there be a "loss" within the policy periods and that Brenneman is liable[12] in its capacity as vessel owner. That is, Plaintiffs argue that because there is no coverage under the P&I policies, there is no indemnity obligation to reimburse defense costs for the Pier Collapse Claims, as there is no policy language requiring an independent duty to defend even when the suit defended against is fraudulent, groundless, or false.

---

[11]Plaintiffs maintain, in addition, that the undisputed evidence shows that ATLAS was seaworthy, was properly operational, and properly performed repairs, (Responses to Requests to Admit at nos. 24-26), and deposition testimony confirms that there were no problems with any aspect of the work with or off the ATLAS that would have contributed to the fall of the pier, (Sullivan Dep., 432-434; Slezak Dep., 35-40). The Court need not delve into that analysis, however.

[12] Again, the Court appreciates the Plaintiffs' argument that this prerequisite to coverage cannot be met because the undisputed facts of record show that the ATLAS was properly operated and seaworthy at all relevant times, but a discussion of that point is not necessary for the Court's decision here.

Typically, the duty to defend is broader than the duty to indemnify.  Rosario v. Haywood, 799 A.2d 32, 40 (N.J. Super. Ct. App. Div. 2002).  In the context of a Comprehensive General Liability policy, it is triggered "when the Complaint against the insured 'states a claim constituting a risk insured against,'" id. (quoting Danek v. Hommer, 100 A.2d 198 (N.J. Super. Ct. App. Div. 1953), aff'd 105 A.2d 677 (N.J. 1954), regardless of whether the claim has merit, id. (citing Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173-74 (N.J. 1992)).  Thus, in the CGL context, the complaint is "laid alongside the policy and the test is whether the allegations of the complaint, upon its face, fall within the risk insured against."  Ohio Cas. Ins. Co. v. Flanagan, 210 A.2d 221, 225 (N.J. 1965) (citing Danek, 100 A.2d 198).  Accord Rosario, 799 A.2d at 40 ("The duty to defend arises when the comparison reveals that, if the allegations of the complaint are sustained, the insurer will be required to pay any resulting judgment.").  Extrinsic facts, outside of the complaint, which are later revealed in discovery, may also trigger a duty to defend.  SL Indus., Inc. v. Am. Motorists Ins. Co., 607 A.2d 1266, 1272 (N.J. 1992).

In this case, however, the obligation on Plaintiffs to reimburse defense costs is a specifically enumerated risk under the indemnification provision of the P&I policy. Even putting aside the argument that the P&I policy is for indemnity only, looking at this issue in the best possible light for Brenneman, the Court has determined that there has been no claim made against Brenneman in its capacity as vessel owner.  Accordingly, even assuming the legitimacy of Brenneman's argument that a duty to defend may be triggered by mere allegations, the allegations made in the Pier Collapse Claims are insufficient because the liability defended against would not have been covered by the policies here.

CONCLUSION

_____Having considered the submissions of the parties, and

_____For the reasons expressed above, as well as on the record during various

discussions with counsel over the course of the past several years,

_____IT IS ORDERED on this 28th day of June, 2007 that the Plaintiffs' motion for

summary judgment [158] is hereby GRANTED.

IT IS FURTHER ORDERED that the Defendant's cross-motion for summary

judgment seeking a declaration of its right to be indemnified for attorneys' fees and costs

[165] is hereby DENIED.


_____/s/Joseph H. Rodriguez___
JOSEPH H. RODRIGUEZ
U.S.D.J.